UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Jennifer Canady, | ) | C/A No. 5:12-2507-KDW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| Carolyn W. Colvin,[1] Acting Commissioner | ) | |
| of Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This social security matter is before the court pursuant to 28 U.S.C. § 636(c) and Local Civil Rule 83.VII.02 (D.S.C.) for final adjudication, with the consent of the parties, of Plaintiff's petition for judicial review. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner"), denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to the Social Security Act ("the Act"). Having carefully considered the parties' submissions and the applicable law, the court orders the Commissioner's decision be reversed and remanded for further administrative action, as discussed herein.

I.      Relevant Background

        A.      Procedural History

Plaintiff applied for DIB and SSI in July 2008,[2] pursuant to Titles II and XVI of the Act, 42 U.S.C. §§ 401-403, and 380-83, *et seq.*, alleging she became disabled on May 28, 2008,[3]

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the court substitutes Carolyn W. Colvin for Michael J. Astrue as Defendant in this action.

because of depression and anxiety. Tr. 66-67, 185. Her applications were denied initially and upon reconsideration. Tr. 75-88, 93-96. Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), Tr. 97-102, which was held on December 15, 2010, Tr. 32-64. In a decision dated January 12, 2011, the ALJ found that Plaintiff was not disabled within the meaning of the Act. Tr. 11-31. The Appeals Council denied Plaintiff's request for review on June 28, 2012, making the ALJ's decision the final decision for purposes of judicial review. Tr. 1-6. Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed on August 30, 2012. ECF No. 1.

B.     Plaintiff's Background

 Plaintiff was born on November 13, 1972 and was 35 years old as of her alleged onset-of-disability date. Tr. 23, 38.  At the time of the hearing Plaintiff lived with her children, ages 18, 16, and 12. Tr. 39. Plaintiff left high school during the 12th grade and obtained her GED. Tr. 40. She has past relevant work ("PRW") as an insurance claims specialist, a document specialist, and as an assistant manager at a fast-food restaurant. Tr. 23, 41-43.

C.     The Administrative Proceedings

1.     Plaintiff's Testimony

Plaintiff appeared with her attorney and testified at the administrative hearing. Tr. 38-58. She indicated her only source of income was child support, and her mother helped her with housing costs. Tr. 39-40. She said she had a driver's license, but only drove in an "extreme emergency and no one else" was there to drive her. Tr. 40. She indicated she weighed about 240

---

[2] Although Plaintiff filed an earlier application for DIB in June 2005, Tr. 65, 75-78, she did not exhaust her administrative remedies. Denial of that application is not before the court. Tr. 156. *See* 20 C.F.R. § 404.905 (initial determination binding unless claimant timely requests reconsideration).

[3] Plaintiff initially alleged that her disability began in May 2005; however, she worked and performed substantial gainful activity until May 2008. *Compare* Tr. 172 *with* Tr. 208-14.

or 250 pounds and that her weight had recently increased about 75 pounds within the prior year. She said she did not know what caused the weight gain. Tr. 40-41.

Plaintiff described her PRW. Tr. 41-42. She said she did not have any diagnosed physical problems that impacted her ability to work, although she said she had a car accident "years ago" that left her with "severe brain trauma." Tr. 43. Plaintiff said she had emotional/mental problems that impacted her ability to work, explaining she had been diagnosed with anxiety and medication-resistant depression. Tr. 44. Plaintiff testified that she did not like to leave the house; could not concentrate; and was tired, depressed, and over-emotional. *Id.* Plaintiff said she took four kinds of medication for her conditions, but that they did not really help at all. *Id.* She said she did not suffer side effects from the medication. Tr. 45. Plaintiff said she was under "constant care" from Dr. Fermo,[4] and was seeing him every six-to-eight weeks. *Id.* Plaintiff noted Dr. Fermo had her participate in an intensive outpatient therapy program several years prior. *Id.*

Plaintiff described her typical day as arising at 6:45 a.m. to be sure her daughter was awake to get ready for school. Tr. 45. When Plaintiff's daughter left the house at about 7:15 or 7:30 a.m., Plaintiff then went back to bed. Tr. 46. She said she slept a lot or just lay in bed all day. *Id.* She said she did not really watch television, although her daughter sometimes watched television in Plaintiff's bedroom. Tr. 47. Plaintiff said her daughters cooked and that she could not stand in the kitchen to do so. *Id.* At times, she said she would make herself a sandwich. Tr. 48. She said she typically went to bed about 9:30 p.m. was able to fall asleep and sleep through the night. Tr. 47.

Plaintiff said she dressed herself and cared for her own hygiene. Tr. 48. Once a month she shopped for food, going late at night when there were not many people shopping. Tr. 48, 54.

---

[4] Spelled "Fermow" in the transcript, the record makes it clear that Plaintiff is referring to her treating psychiatrist, Ricardo J. Fermo, M.D.

She said she also went to the drug store at that time. Tr. 54. Plaintiff said her daughters did the housework. Tr. 48. Plaintiff said she did not use the computer, did not exercise, or have hobbies. Tr. 49. She said she did not have any entertainment, and that her boyfriend had left her about one month ago because she never wanted to do anything. *Id.*

Plaintiff testified that she drank a few drinks of alcohol every-other weekend, when her youngest daughter was at her father's home. Tr. 50. Plaintiff said she recalled telling a doctor in February 2010 that she drank about three-or-four liquor drinks per day, but she said she did not do that now. *Id.* Plaintiff said she had not grown up around alcohol and had started drinking a few months before January 2010. *Id.* She said the daily drinking made her feel "[n]ot good[,]" so she now only drank when her youngest daughter was away. Tr. 51-52.

Plaintiff said she had tried to assist her daughter with homework, but was unable to concentrate to do so. Tr. 53. Plaintiff said she did not go anywhere except the grocery and drug stores, and that she did not participate in school activities with the children, although her youngest child played in the band. Tr. 54-55.

Plaintiff said she had left her job with a healthcare company because she could not concentrate, was sleepy and emotional all the time, and it affected her job performance. Tr. 56. She said she tried to get disability at that point, but was denied, so she again tried to work, taking a job with Hill-Rom. Tr. 56-57. She said she had problems concentrating and doing her work at that job, as well, so she went out on leave under FMLA [the Family Medical Leave Act]. Tr. 57. She said when her FMLA leave ended, Hill-Rom "chose to let [her] go and not come back to work." *Id.*

2.    Vocational Expert Testimony

Vocational Expert ("VE") Art Schmidt also testified at the hearing. Tr. 59-61. He categorized Plaintiff's PRW as ranging from semi-skilled to skilled and from the light-to-medium exertional level. Tr. 60. The ALJ asked the VE to assume a hypothetical individual who was the same age (younger individual), with the same education, and who could perform work at all exertional levels, but was able to perform only simple tasks with no more than occasional contact with coworkers, supervisors, or the general public. Tr. 60. The VE testified the individual could work as a companion (630,000 jobs in the national economy, 4,800 in South Carolina); janitorial (2,090,000 jobs in the national economy, 27,600 jobs in South Carolina); laundry operator (211,490 jobs in the national economy, 3,190 jobs in South Carolina). Tr. 60-61. The VE testified that these jobs were consistent with the description in the Dictionary of Occupational Titles ("DOT") and as they are performed in the national economy. Tr. 59. When asked whether there were any jobs the same individual could perform if restricted to sedentary work, the VE said that individual could perform jobs such as a sit-down system monitor, a telephone quotation clerk, or a weight inspector/weight tester. Tr. 61. The ALJ then further narrowed the hypothetical, describing a person who would have extreme limitations in concentration, persistence, and pace, so she could not concentrate for any extended period of time. Tr. 61. The VE testified that there would be no jobs such a person could perform. Tr. 62.

The VE testified that, for all of the jobs he had identified in responding to the hypotheticals, the industry standard would be the worker could miss no more than three days per month and maintain employment. Tr. 62. He opined if such a person missed more than four days per month, there would be no jobs for that person. *Id.*

5

D.     The ALJ's Findings

In his January 12, 2011 decision, the ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

2.  The claimant has not engaged in substantial gainful activity since May 28, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: anxiety and depression (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is limited to simple tasks with no more than occasional contact with co-workers, supervisors or the general public.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on November 13, 1972 and was 35 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from May 28, 2008, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 14-25.

## II.   Discussion

### A.   Legal Framework

#### 1.   The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability," defined as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims).  An examiner must consider the following:  (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the listings;[5] (4) whether such impairment prevents claimant from performing PRW; and (5) whether

---

[5] The Commissioner's regulations include an extensive list of impairments ("the listings" or "listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii); § 416.920(a)(4)(iii). To meet or equal one of these listings, the

the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520, § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) and § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); § 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen*, 482 U.S. at 146 n.5 (regarding burdens of proof).

---

claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish her impairment is disabling at Step 3).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d at 290 (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 428 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational. *See Vitek*, 428 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

Plaintiff asserts that the ALJ erred in the following manner: (1) by finding Plaintiff was not disabled because she did not meet or medically equal listing 12.04 (Affective Disorders)[6] and by failing to include the required listing analysis in his decision; and (2) by finding Plaintiff was not disabled by improperly ascribing more weight to the opinions of nontreating medical sources and failing to give controlling weight to the opinion of Plaintiff's treating psychiatrist, Ricardo J. Fermo, M.D. Pl.'s Br. and Reply, ECF Nos. 24, 30. The Commissioner contends that the ALJ's decision is supported by substantial evidence. Def.'s Br., ECF No. 26.

1.    Relevant Medical Evidence Regarding Plaintiff's Mental Health[7]

Dr. Fermo began treating Plaintiff for depression on April 22, 2002. *See* Tr. 408. The record contains Dr. Fermo's treating notes while he was affiliated with the MUSC Institute of Psychiatry, Tr. 382-33, 412-15, and subsequently with East Cooper Psychiatry, Tr. 462-85.

On March 31, 2009, Dr. Fermo completed a "Mental Impairment Questionnaire (Listings)" in which he assessed Plaintiff's impairments and their impact on her abilities. Tr. 408-11. Dr. Fermo noted Plaintiff's prognosis was "poor." Tr. 409. He also noted some of Plaintiff's signs and symptoms related to her depression. Tr. 409. Dr. Fermo opined Plaintiff's psychiatric condition did not exacerbate Plaintiff's pain or other physical symptoms. Tr. 410. He indicated Plaintiff's limitations were "extreme," (as opposed to none/mild/moderate/marked) in these areas: restriction of activities of daily living ("ADLs"); difficulties in maintaining social functioning; and deficiencies of concentration, persistence or pace." Tr. 410. Dr. Fermo indicated Plaintiff had a "[m]edically documented history of a chronic organic mental, schizophrenic, etc.

---

[6] Although the ALJ also found Plaintiff did not meet or medically equal listing 12.06 (Anxiety-Related Disorders), Plaintiff did not challenge that finding and it is not considered herein.
[7] Because Plaintiff challenges the ALJ's decision only as it regards her alleged mental impairments, this Order does not focus on other medical evidence.

or affective disorder of at least 2 years' duration that has caused more than a minimal ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support." Tr. 410. In addition, Dr. Fermo opined Plaintiff had a "residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate[;]" as well as "[t]hree episodes of decompensation within 12 months, each at least two weeks long[;]" and a "[c]urrent history of 1 or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement." Tr. 410-11. Dr. Fermo indicated Plaintiff was not a malingerer. *Id.* He concluded his opinion by indicating Plaintiff was a "[patient] with treatment resistant depression and severely impaired." *Id.*

Other mental health professionals offered opinions regarding Plaintiff's functional abilities related to her mental impairment as a part of the disability-review process. On December 5, 2008, Cashton B. Spivey, Ph.D. performed a clinical interview of Plaintiff, administered the "Mini-Mental State Examination," and provided a written Psychological Evaluation. Tr. 384-88. He described Plaintiff as appropriately dressed and groomed. Tr. 385. Plaintiff scored a 26 out of a possible 30 on the Mini-Mental State Examination, which Dr. Spivey indicated was within normal limits, "yet may reflect aspects of cognitive difficulties." Tr. 386. Dr. Spivey found that Plaintiff's language skills were intact and that she was able to reproduce a drawing accurately. *Id.* Plaintiff was able to follow two steps of a three-step command, and she demonstrated a satisfactory general fund of information and intact abstract reasoning abilities. *Id.* Plaintiff could only recall one of three objects after a five-minute interval, which Dr. Spivey indicated suggested "possible impairment in her short-term auditory memory

functioning." *Id.* Dr. Spivey diagnosed Plaintiff with "[m]ajor depressive episode, anxiety disorder, not otherwise specified" and assessed her then-current GAF score[8] as 40 with the highest during the past twelve months as 50. *Id.* Dr. Spivey's diagnosis also indicated "rule out narcolepsy." *Id.*

In February 2010, Mark A. McClain, Ph.D. performed a consultative examination of Plaintiff in connection with her application for SSI benefits. Tr. 416-20. Plaintiff provided Dr. McClain with historical information regarding her mental- and physical-health history, as well as information about her day-to-day activities. Tr. 416-17. Dr. McClain also reviewed the 2008 examination performed by Dr. Spivey. Tr. 417. Plaintiff advised Dr. McClain she was able to care for her personal needs and ADLs, although she indicated she was generally depressed and did not care for her personal hygiene regularly. *Id.* Dr. McClain noted that Dr. Fermo was following Plaintiff for depression and anxiety and managing her medications, which included gabapentin, fluoxetine, alprazolam, and bupropion XL. *Id.* On examination, Dr. McClain noted that Plaintiff was appropriately dressed and groomed, and that she was cooperative, although he

---

[8] A Global Assessment of Functioning ("GAF") score is used by mental health clinicians and doctors to rate the social, occupational, and psychological functioning of adults. GAF scores range from 0-100. The higher a score, the greater an individual's ability to function and carry out activities of daily living. *See Parker v. Astrue*, 664 F. Supp. 2d 544, 549, nn.2-3 (D.S.C. 2009) (referencing Diagnostic & Statistical Manual of Mental Disorders-Text Revision (DSM-IV-TR) (2000)). In *Parker v. Astrue*, the court cited to the DSM-IV's description of several ranges of GAF, as follows:

> A GAF score of 51-61 indicates moderate symptoms (e.g., circumstantial speech and occasional panic attacks) or moderate difficulty in social or occupational functioning (e.g., no friends, unable to keep a job). A GAF score of 61-70 is less severe and indicates only that a person has "some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally function[s] pretty well, [and] has some meaningful interpersonal relationships." Diagnostic & Statistical Manual of Mental Disorders-Text Revision (DSM-IV-TR) (2000).

664 F. Supp. 2d at 549 n.3.

noted she appeared "subdued and slow to respond." *Id.* He noted her attention was "adequate," and that she responded only to directly posed questions. He found her vocabulary commensurate with her age and educational experience. *Id.* Dr. McClain found Plaintiff had a restricted affect and a dysphoric mood. *Id.* He noted Plaintiff had reported to him that she was "depressed most of each day, most days of the week[,]" and that she had "been depressed on a consistent daily basis for at least the past eight years." *Id.* Plaintiff reported she had a decreased appetite and slept excessively. *Id.* Plaintiff also reported she experienced "significant anxiety symptoms on a consistent daily basis." Tr. 418. Plaintiff informed Dr. McClain she generally stayed at home to manage her anxiety level. *Id.* Plaintiff did not exhibit or report signs of psychotic thought processes. *Id.* Plaintiff indicated she consumed three-to-four alcoholic drinks each day, and sometimes drank until she passed out. *Id.* Plaintiff denied having any problems with drug or alcohol abuse. *Id.*

Dr. McClain also administered the "Mini-Mental State Examination" to Plaintiff, and she obtained a score of 28 out of a possible 30 points. Tr. 418. Dr. McClain noted Plaintiff's score was within normal limits, noting her mistakes were from being unable to remember two of three words when asked to recall them five minutes later. *Id.* Dr. McClain diagnosed Plaintiff with dysthymia and generalized anxiety disorder with agoraphobia. Tr. 419. He indicated Plaintiff could "continue the benefit from participation in medication management with her current providers[,]" and he suggested she discuss with her psychiatrist the "availability and appropriateness" of counseling in addition to medication to treat her symptoms. *Id.* Dr. McClain assessed Plaintiff with a GAF of 60, both current and highest past year. Tr. 416-20. He included in his summary:

> In summary, testing results, behavior observation, and clinical interview reflect a
> 37-year-old female, who is currently reporting significant symptoms of depressed

mood and anxiety. [Plaintiff's] report suggests that her depressive symptoms have been present on a consistent daily basis for at least the past eight years. This is consistent with dysthymic disorder. [Plaintiff] also reported experiencing moderate to significant anxiety symptoms on a consistent basis.

*Id.*

        2.   The ALJ's Consideration of Listing 12.04.

Plaintiff argues the ALJ improperly found her impairments did not meet or medically equal listing 12.04. *See* Pl.'s Br. 5-15, ECF No. 24; Pl.'s Reply 1-6, ECF No. 30. The Commissioner counters, arguing the ALJ reasonably concluded Plaintiff's impairments did not meet or medically equal the listing 12.04 criteria. Def.'s Br. 8-15, ECF No. 26.

Listing 12.04 provides in pertinent part:

12.04 Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A.     Medically documented persistence, either continuous or intermittent, of one[9] of the following:

1.     Depressive syndrome characterized by at least four of the following:
        a.     Anhedonia or pervasive loss of interest in almost all activities; or
        b.     Appetite disturbance with change in weight; or
        c.     Sleep disturbance; or
        d.     Psychomotor agitation or retardation; or
        e.     Decreased energy; or
        f.     Feelings of guilt or worthlessness; or
        g.     Difficulty concentrating or thinking; or
        h.     Thoughts of suicide; or
        i.     Hallucinations, delusions or paranoid thinking; or

          . . .

---

[9] Section A of listing 12.04 can be satisfied by meeting the requirements of listing 12.04A1 (Depressive syndrome), A2 (Manic syndrome), or A3 (Bipolar disorder). As Plaintiff submits she satisfies listing 12.04A1 (Depressive syndrome), the court does not consider listing 12.04A2 or A3.

And

B.    Resulting in at least two of the following:
    1.    Marked restriction of activities of daily living; or
    2.    Marked difficulties in maintaining social functioning; or
    3.    Marked difficulties in maintaining concentration, persistence, or pace; or
    4.    Repeated episodes of decompensation, each of extended duration;

Or

C.    Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

    1.    Repeated episodes of decompensation, each of extended duration; or

    2.    A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

    3.    Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.

At step three of the sequential analysis, the ALJ found Plaintiff's "mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06." Tr. 17. Both listings 12.04 and 12.06 concern mental disorders: listing 12.04 concerns affective disorders; listing 12.06 concerns anxiety-related disorders. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00A.[10] As the regulation explains, these listings both "consist[] of a statement describing the disorder(s) addressed by the listing, paragraph A criteria (a set of medical findings), and paragraph B criteria (a set of impairment-related functional limitations)." *Id.* These listings also contain "additional functional criteria (paragraph C criteria)." *Id.* The

---

[10] Although the ALJ determined Plaintiff did not meet or medically equal either listing 12.04 or 12.06, Plaintiff's appeal asserts error only as to listing 12.04.

Commissioner will find that a claimant satisfies listing 12.04 or 12.06 if he or she satisfies the A and B criteria or the A and C criteria. *Id.* The paragraph A criteria (medical findings) and paragraph C criteria (additional functional criteria) vary for listings 12.04 and 12.06 as they are specific to each disorder. The "B" paragraph criteria are the same for both listings the ALJ considered. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04, 12.06.

In explaining why he found Plaintiff had not satisfied either listing, the ALJ did not reference the "A" criteria at all. In defending the ALJ's decision, the Commissioner notes that Plaintiff satisfies the "A" criteria because the ALJ found Plaintiff's depression and anxiety were severe medically determinable impairments. Def.'s Br. 10.

The ALJ devoted the bulk of his step-three analysis to discussing why Plaintiff had not satisfied the paragraph B criteria. Tr. 17-18. As the ALJ explained, to satisfy the paragraph B criteria, a claimant's mental impairments must result in at least two of the following: marked restriction of ADLs; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. Tr. 17. The term "marked" is "a standard for measuring the degree of limitation, it means more than moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00C (citing 20 C.F.R. §§ 404.1520a and 416.920a).

The ALJ found Plaintiff had only mild restriction of her ADLs; moderate difficulties in social functioning; moderate difficulties regarding concentration, persistence, or pace; and had zero episodes of decompensation of extended duration. Tr. 17. In support of his findings

regarding each of these categories other than the episodes of decompensation, the ALJ referenced "Exhibit 17E," which is the Function Report Plaintiff completed on January 13, 2009, in support of her application. Tr. 17 (citing ex. 17E, available at Tr. 253-63). Regarding Plaintiff's ADLs, the ALJ supported his finding that Plaintiff was mildly restricted by noting her reporting that she is capable of dressing and bathing, making simple meals, and vacuuming. Tr. 17. Regarding the ALJ's finding that Plaintiff had moderate difficulties with social functioning, the ALJ noted Plaintiff had reported having no hobbies or interests and having no friends. Tr. 17. He also noted Plaintiff indicated she got along with authority figures and had never been fired because of problems getting along with others, but that she indicated she had difficulty handling stress or changes in routine. *Id.* Regarding his finding Plaintiff had moderate difficulties with concentration, persistence, or pace, the ALJ again cited to Plaintiff's January 13, 2009 responses on the Function Report. Tr. 17. He noted Plaintiff said she needed help remembering things and had difficulty following written or spoken directions. *Id.* The ALJ noted, however, that "records indicate [Plaintiff] is able to manage her own finances." *Id.* (citing to ex. 17E, available at Tr. 253-63). Finally, the ALJ stated Plaintiff had experienced no extended periods of decompensation and found she had not satisfied the paragraph B criteria. Tr. 17-18.

The ALJ then referenced the paragraph C criteria. His full analysis of whether Plaintiff satisfied the paragraph C criteria is as follows: "The undersigned has also considered whether the 'paragraph C' criteria are satisfied. In this case, the evidence fails to establish the presence of the 'paragraph C' criteria." Tr. 18.

The court agrees with Plaintiff that the ALJ's listing analysis is insufficient. In determining whether a claimant's impairments satisfy the requirements for a relevant listing, the ALJ must identify the relevant listed impairment or impairments, discuss the relevant evidence,

and compare that evidence to the requirements in the applicable listings. *Cook v. Heckler*, 783

F.2d 1168, 1173 (4th Cir. 1986); *see Nelson v. Astrue*, C.A. No. 0:07-3114-HFF, 2009 WL

742724, *1, 5 (D.S.C. Mar.19, 2009) (remanding for further proceedings because ALJ provided

no discussion of the listings and did not explain his finding that claimant had not met or

medically equaled a listing).

In *Cook*, the Fourth Circuit considered the sufficiency of the following findings by an

ALJ in determining that claimant did not satisfy a particular listed impairment:

> "An examination and x-rays of the right hip and left shoulder in May 1983
> established the existence of severe osteoarthritis with moderate to severe
> limitation of motion of the claimant's shoulders, elbows, wrists, knees, hips, neck,
> and back as well as markedly decreased grip. However, the claimant's arthritis
> impairment does not meet or equal in severity the requirements of Section 1.01 of
> Appendix 1, Subpart P as there is no joint enlargement, deformity, effusion, or the
> other mandated criteria."

*Cook*, 783 F.2d at 1172-73 (quoting from the ALJ's decision under review). The Fourth Circuit

found that explanation to be deficient because the ALJ had not identified the relevant listed

impairments and "failed to compare [the claimant's] symptoms to the requirements of any of the

four listed impairments, except in a very summary way." *Id.* at 1173. In this case, the court finds

that, much like the analysis the *Cook* court found lacking, the ALJ did not adequately analyze

whether Plaintiff satisfied the requirements of the applicable listings.[11]

Most problematic is the ALJ's bare-boned finding that Plaintiff did not satisfy the

requirements set forth in paragraph C of a listing. Tr. 18 (noting only that he had "considered"

whether requirements satisfied and that "the evidence fails to establish the presence of the

'paragraph C' criteria."). The ALJ found Plaintiff did not satisfy either listing 12.04 or 12.06, Tr.

17, so, presumably, he made a determination Plaintiff did not satisfy paragraph C of either

listing. However, because his decision includes no substantive discussion of the paragraph C

---

[11] Plaintiff only challenges the findings as to listing 12.04.

criteria of any listing, it is not possible to determine what the ALJ considered and what he found the "evidence fail[ed] to establish." *See* Tr. 18.

Plaintiff has placed only listing 12.04 at issue. To satisfy paragraph C of the listing, Plaintiff must establish a "[m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support," as well as one of the following:

> 1.      Repeated episodes of decompensation, each of extended duration; or
> 2.      A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
> 3.      Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.

Here, the ALJ did not reference any detail of the paragraph C criteria, nor did he offer any discussion of the medical evidence to explain why it did not satisfy one of the three alternative criterion in paragraph C. This omission makes it impossible for the court to determine whether the ALJ's determination that Plaintiff did not satisfy listing 12.04 is based on substantial evidence. *Cook*, 783 F.2d at 1173.

Defending the ALJ's analysis of the paragraph C criteria of listing 12.04, the Commissioner submits that those criteria "require[] a 'current history of 1 or more years' inability to function outside a highly supportive living arrangement.'" Def.'s Br. 14 (partially quoting listing 12.04C3). As an initial matter, paragraph C does not "require" that a claimant satisfy this particular criterion. Rather, to establish paragraph C, a claimant must satisfy the definition set out in the beginning of paragraph C and *one* of the *three* criteria then listed.

Accordingly, a claimant could satisfy paragraph C of the listing by satisfying the beginning definition of paragraph C and satisfying the criterion in paragraph C1, C2, **or** C3. Satisfying paragraph C3 is not itself an absolute requirement.  As discussed above, a claimant is found to satisfy listing 12.04 by satisfying paragraph A (which is not disputed herein) and paragraph B or paragraph C. Here, because the ALJ did not discuss the particulars of why he found Plaintiff had not satisfied paragraph C at all, the court cannot further analyze the ALJ's finding.

Similarly unavailing is the Commissioner's argument that the paragraph C criteria were not satisfied because two state agency psychologists "reviewed the evidence and found Plaintiff did *not* meet (the 'B- or C criteria' of) a listing." Def.'s Br. 14 (citing to Tr. 389-401 and 432-33). The type of post-hoc rationalization does not remedy the deficient analysis by the ALJ. *Steel v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) ("But regardless whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for her decision and confine our review to the reasons supplied by the ALJ."). In any event, reference to these opinions alone does not provide substantial evidence to support the ALJ's finding. Although the opinions of both Medical Consultant ("MC") Neboschick and MC Tezza briefly indicate that the evidence did not establish presence of the criteria of paragraph C in listing 12.04, Tr. 400, 433, their opinions do not explain those opinions.

The court remands this matter for more detailed consideration of the record evidence in view of the paragraph C criteria. In considering the evidence, the ALJ specifically is instructed to consider the opinion of Plaintiff's treating psychiatrist, Dr. Fermo. Tr. 408-11. The court notes that Dr. Fermo opined Plaintiff satisfied criteria corresponding to the paragraph C criteria. *See* Tr. 410-11.

In so ruling, the court is cognizant that the ALJ considered and discussed portions of Dr. Fermo's March 31, 2009 opinion in connection with the step-four analysis. *See* Tr. 22-23. In that portion of the decision, the ALJ discounted Dr. Fermo's opinion as being unsupported by the record. Tr. 22. For example, the ALJ cited to several exhibits and noted that, although Dr. Fermo noted Plaintiff had symptoms of depression and anxiety, he did not "indicate any limitations or reference episodes of decompensation." *Id.* (citing to exs. 11F, available at 412-15; 19F, available at 461-73; and 20F, available at 474-85). The ALJ also cited to various records from Plaintiff's visits to Dr. Fermo, noting, for instance, that Plaintiff had a "partial response to medication" at times (November 2008 and March 2009), and a "poor response" to medication in January 2010. Tr. 22-23. The ALJ noted that by July 2010, Plaintiff stated she was better able to pay attention and concentrate, but that she reported the return of some of her depressive symptoms in October 2010, although "not to the extent indicated in Dr. Fermo's statement." Tr. 23.

On remand, the ALJ is to consider Dr. Fermo's opinion and treatment records, as well as the other opinions of record, considering the guidance of the Commission's regulations regarding chronic mental impairments. In particular, the following regulation is particularly relevant to criteria 2 of paragraph C of 12.04:

> E. Chronic Mental Impairments. Particular problems are often involved in evaluating mental impairments in individuals who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication. For instance, if you [referring to a claimant] have chronic organic, psychotic, and affective disorders, you may commonly have your life structured in such a way as to minimize your stress and reduce your symptoms and signs. In such a case, you may be much more impaired for work than your symptoms and signs would indicate. The results of a single examination may not adequately describe your sustained ability to function. It is, therefore, vital to review all pertinent information relative to your condition, especially at times of increased stress. [The Commissioner] will attempt to obtain adequate descriptive

information from all sources that have treated you in the time period relevant to
the determination or decision.

20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.00E.  Further, Section 12.00D2 recognizes the need for

longitudinal evidence and acknowledges that a claimant's "level of functioning may vary

considerably over time. The level of functioning at a specific time may seem relatively adequate

or, conversely, rather poor." *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00D2. In considering

whether Plaintiff satisfies listing 12.04, the ALJ is to consider all medical and opinion evidence

with this guidance in mind.

Because remand is required so that the ALJ can complete the paragraph-C portion of the

analysis of listing 12.04, the ALJ is to also further consider the paragraph B requirements.

Although the ALJ summarily cited to statements made by Plaintiff in the Function Report she

submitted to support those findings, the discussion is cursory at best. *See Cook,* 783 F.2d at

1173. In her challenge to this portion of the ALJ's decision, Plaintiff focuses on the opinion of

treating psychiatrist Dr. Fermo, as well as the opinion of Consultative Examiner Dr. Spivey and

the findings that Plaintiff had predominately had a GAF score of 40-50. Pl.'s Br. 7-11. As noted

above, a GAF score offers guidance regarding an individual's ability to function. *See* n.7, *supra*.

Dr. Fermo opined Plaintiff had "extreme" limitations in ADLs; social functioning; and

concentration, persistence, and pace. Tr. 410. In further considering the paragraph B criteria of

listing 12.04, the ALJ is to consider all relevant medical evidence and explain his findings.[12]

---

[12] In so ordering, the court does not suggest the ALJ erred merely by failing to discuss the
medical and opinion evidence in the particular portion of the decision regarding the listing
analysis. *See McCarty v. Apfel*, 28 F. App'x 277, 279-80 (4th Cir. 2002) (finding that "the ALJ
need only review medical evidence once in his decision" and therefore, the ALJ's thorough
analysis of the medical evidence at step four was sufficient to determine whether claimant
satisfied step three). In this case, however, the ALJ did not adequately discuss the medical and
opinion evidence concerning listing 12.04 in the step-three portion of the decision or otherwise.

### 3.  Additional Allegations of Error

In challenging the ALJ's assessment of whether she met or medically equaled a listed impairment, Plaintiff also submits the ALJ did not accord appropriate weight to the opinion evidence.[13] As discussed above, the ALJ is to consider all opinion evidence—including that of Plaintiff's treating psychiatrist Dr. Fermo—in considering whether Plaintiff meets or medically equals a listed impairment. These additional considerations will impact the ALJ's determination of whether Plaintiff meets a listing as well as the subsequent steps of the sequential process. To the extent Plaintiff's challenge to the ALJ's decision extends to other portions of the ALJ's sequential analysis, the court does not now consider such issues as they may be rendered moot. *See Boone v. Barnhart*, 353 F.3d 203, 211 n.19 (3d Cir. 2003) (remanding on a particular ground and declining to address claimant's additional arguments).

## III.    Conclusion

Accordingly, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions, it is ordered that the Commissioner's decision be reversed and remanded for further administrative action as detailed within.

---

[13] The Social Security Administration typically accords greater weight to the opinion of a claimant's treating medical sources, because such sources are best able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. § 404.1527(c)(2). However, "the rule does not require that the testimony be given controlling weight." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam). Rather, "[c]ourts evaluate and weigh medical opinions pursuant to the following non-exclusive list:  (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson v. Barnhart*, 434 F.3d at 654; 20 C.F.R. § 404.1527. Treating source medical opinions are entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527.

IT IS SO ORDERED.

March 5, 2014                                    Kaymani D. West
Florence, South Carolina                         United States Magistrate Judge